# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-1309

**GEORGE WOFFORD, ET AL.**

**VERSUS**

**JAMES S. DUNNICK, M.D., ET AL.**

************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2003-5072
HONORABLE WILFORD D. CARTER, DISTRICT JUDGE

************

## DAVID E. CHATELAIN[*]
## JUDGE

************

Court composed of Sylvia R. Cooks, James T. Genovese, and David E. Chatelain, Judges.

**AFFIRMED.**

**Charles J. Boudreaux, Jr.**
**J. Michael Fussell, Jr.**
**Preis & Roy**
**Post Office Drawer 94-C**
**Lafayette, Louisiana 70509**
**(337) 237-6062**
**Counsel for Defendants/Appellees:**
    **St. Paul Fire & Marine Insurance Company**
    **James S. Dunnick, M.D.**
    **Carl P. Fastabend, M.D.**

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Joseph T. Dalrymple**
**Dalrymple & Ledet**
**Post Office Drawer 14440**
**Alexandria, Louisiana  71315-1818**
**(318) 442-1818**
**Counsel for Plaintiffs/Appellants:**
    **George Wofford**
    **Gail Wofford**
    **Kevin Wofford**

**CHATELAIN, Judge Pro Tempore.**

In this medical malpractice case, the plaintiffs, George Wofford, his wife, Gail, and their son, Kevin (sometimes hereinafter collectively referred to as "the plaintiffs"), appeal the trial court's grant of summary judgment in favor of the defendants, Dr. James Dunnick and his medical malpractice insurer, the St. Paul Fire and Marine Insurance Company (St. Paul) (sometimes hereinafter collectively referred to as "the defendants"), and the resulting dismissal of their claims against these defendants. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

George Wofford, fifty-nine years of age, presented to the emergency room at Lake Charles Memorial Hospital (LCMH) on the morning of April 12, 2001, complaining of pain and tightness in his chest since the previous evening. He was seen by Dr. Dunnick, a partner of his treating cardiologist, Dr. Carl Fastabend. At 9:15 a.m., Dr. Dunnick ordered a stress test for the following morning. In the meantime, Dr. Dunnick requested copies of Mr. Wofford's medical records[1] and arranged for follow-up cardiac enzymes testing to be done so that he could compare those results with the results from tests that had been performed earlier that morning. Instead of conducting the stress test on the following morning as Dr. Dunnick ordered, the LCMH staff, without physician supervision, performed the stress test at 11:45 that same morning. Four minutes into the stress test, Mr. Wofford went into ventricular tachycardia, an abnormally rapid heart rhythm, and the test was stopped.

_____

[1]Mr. Wofford had informed Dr. Dunnick that Dr. Fastabend had performed a heart catheterization on him two years prior and that the test had not revealed any significant coronary artery disease. Unbeknownst to Dr. Dunnick, Dr. Fastabend had actually concluded in his December 15, 1999 Cardiac Catheterization Report that Mr. Wofford suffered from "significant coronary artery disease."

1

Shortly thereafter, Mr. Wofford became unresponsive, requiring immediate resuscitative efforts. Dr. David Dupke, a cardiologist, defibrillated Mr. Wofford, and, by 1:45 p.m., he was in stable condition. Dr. Dunnick later spoke to Mrs. Wofford about the need for Mr. Wofford to be evaluated in the catheterization lab. Initially, Mrs. Wofford told Dr. Dunnick that she did not want her husband to undergo heart catheterization or coronary angioplasty. However, after discussing the situation with her husband, Mrs. Wofford informed Dr. Dunnick that they now agreed to the recommended evaluation, but they preferred to have Dr. Fastabend perform any necessary procedures.

Later that afternoon, Dr. Fastabend performed a coronary angiogram on Mr. Wofford. According to a report prepared by Dr. Fastabend, the angiogram revealed "fairly diffuse coronary artery disease with acute occlusion [(blockage)] of a ramus intermedialis as the cause of acute infarction [(heart attack)]." The angiogram further revealed "significant disease in the proximal large diagonal branch, mid left anterior descending, small circumflex marginal branches and in the nondominant right coronary artery." Dr. Fastabend attempted to perform an angioplasty of the blockage in the ramus, but the "procedure was abandoned as unsuccessful" due to the "inability to cross [the] total occlusion" with a guidewire. Throughout the remainder of his stay at LCMH, Mr. Wofford received conservative medical management for his heart attack, and he experienced no recurrent chest pain, arrhythmias, or other problems. Upon Mr. Wofford's discharge from the hospital on April 15, 2001, Dr. Fastabend noted that he was in good condition. Nonetheless, Dr. Fastabend recommended that Mr. Wofford consider coronary artery bypass surgery at a later date due to his multi-level coronary artery disease.

2

During a May 1, 2001 visit to Dr. Fastabend's office, Mr. Wofford reported that he had been feeling well, although he had remained somewhat inactive. He denied experiencing any recurrent chest discomfort or other problems. Dr. Fastabend noted that he would reevaluate Mr. Wofford for "multi-vessel revascularization surgery" in six to eight weeks. In the meantime, Mr. Wofford was examined by Dr. J. F. Howell, a professor of surgery at Baylor College of Medicine in Houston, Texas, and on May 14, 2001, Mr. Wofford underwent a coronary artery bypass. Although he tolerated the surgery well, Mr. Wofford developed deep venous thrombosis in his right arm. In a June 25, 2001 letter to Dr. Fastabend, Dr. Howell noted that when Mr. Wofford returned to his office for a follow-up visit on June 19, 2001, he was asymptomatic.

On April 10, 2002, the plaintiffs filed a request for a medical review panel (MRP) with the Louisiana Patient's Compensation Fund against Drs. Dunnick and Fastabend. A MRP convened in June of 2003, and, on July 10, 2003, the MRP unanimously exonerated both Drs. Dunnick and Fastabend with regard to their treatment of Mr. Wofford. On September 19, 2003, the plaintiffs instituted this lawsuit against Drs. Dunnick and Fastabend, and their insurer, St. Paul.[2]

On September 14, 2004, Drs. Dunnick and Fastabend, and their insurer, St. Paul, filed a motion for summary judgment. By agreement of the parties, however, the plaintiffs agreed to enter summary judgment in favor of Dr. Fastabend and St. Paul, in its capacity as his insurer, and to dismiss their claims against them with prejudice. The parties further agreed to continue the motion for summary judgment filed by Dr. Dunnick and St. Paul, in its capacity as his insurer, because the plaintiffs

---

[2]The plaintiffs later filed a supplemental petition naming LCMH as an additional defendant.

3

had recently retained Dr. Louis Leatherman, a cardiologist from Texas, as an expert witness and because the plaintiffs wanted to depose Dr. Dunnick.

On March 24, 2009, almost six years after the plaintiffs instituted this lawsuit, Dr. Dunnick and St. Paul filed a second motion for summary judgment seeking to have the plaintiffs' petition against them dismissed. Their motion relied on the favorable MRP opinion rendered in this matter as well as Mr. Wofford's medical records. In addition, the defendants attached to their motion an excerpt from Dr. Dunnick's deposition wherein he stated that he had not ordered Mr. Wofford's stress test moved up to April 12, 2001, and that he did not learn that the test had been moved up until "after the events."

The plaintiffs opposed the motion, attaching to their opposition the affidavit of Dr. Louis Leatherman. Therein, Dr. Leatherman noted that Mr. Wofford "had known coronary artery disease based on a coronary angiogram done by Dr. Carl Fastabend on December 15, 1999." He further noted that when Mr. Wofford "presented to the emergency room, he had not only chest pain, hypertension, a history of known coronary artery disease but also cardiac enzyme elevations" but that "[w]ith these known risk factors, the physician chose to subject Mr. Wofford to stress testing around mid-day on April 12, 2001." Dr. Leatherman stated that, in his opinion "order[ing] and/or performing a cardiac stress test on a patient with the history" that Mr. Wofford had "is poor medical judgment to say the least." Dr. Leatherman further opined that "[a]nother reason for not performing a stress test on this patient is the fact that his cardiac enzymes were elevated in the emergency room." The plaintiffs also attached to their opposition the deposition of Gelena Statum, a nurse stationed in the cardiology department of LCMH who was present during Mr. Wofford's stress test.

4

Therein she stated, "Honestly, I don't remember who was talked to, which physician. I only know that we never do any tests or proceed with any tests without a direct physician's order."

The defendants countered, reiterating that Dr. Dunnick did not order the stress test be moved up a day early. Addressing Dr. Leatherman's affidavit, the defendants noted that Dr. Leatherman was wrong in his assumption that Dr. Dunnick had the benefit of reviewing the 1999 angiogram when he ordered the stress test. To the contrary, Dr. Dunnick testified in his deposition that he had scheduled the stress test for the following day to give him time to review Mr. Wofford's past medical records, to have follow-up cardiac enzymes testing done, to have follow-up electrocardiograms run, and to have the opportunity to speak with Mr. Wofford the next morning to revisit his symptoms before the test. The defendants further pointed out that the plaintiffs have produced no evidence to prove that Dr. Dunnick had ordered or approved the stress test being moved up a day earlier than originally scheduled. The defendants contended that the plaintiffs' only evidence in that regard is the circular argument made in LCMH's answer to interrogatories that the stress test would not have been moved up without a physician having approved the change. However, when asked in discovery what doctor approved the confirmation to proceed with the stress test a day earlier than scheduled, LCMH answered, "Unknown." The defendants further pointed out that nowhere in the deposition testimony of Nurse Statum did she state that Dr. Dunnick ordered the test moved up. Given the fact that Dr. Dunnick provided deposition testimony stating that he did not order the test to be moved up, the defendants submitted that no genuine issue of material fact exists in this regard and that Dr. Dunnick and St. Paul should be dismissed. The defendants

5

noted that the plaintiffs still have recourse against LCMH, a party whom the MRP determined to have breached the applicable standard of care in that it had no documentation in Mr. Wofford's records to show that physician contact was made before the stress test was moved up.

Following a hearing, the trial court rendered judgment in open court granting summary judgment in favor of the defendants and dismissing the plaintiffs' claims against them with prejudice. A written judgment was signed on June 24, 2009.

The plaintiffs now appeal, assigning two errors. First, they claim that the trial court erred in disregarding that portion of Dr. Leatherman's affidavit which indicated that Dr. Dunnick committed malpractice in ordering that Mr. Wofford undergo a stress test under the circumstances existing at his presentation to the emergency room. Second, they contend that the trial court erred in granting the defendants' motion for summary judgment despite its finding that a serious material issue of fact remained.

**OVERVIEW: SUMMARY JUDGMENT**

This court recently discussed the standard of review to be employed by an appellate court when reviewing a motion for summary filed in a medical malpractice case:

> A motion for summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria as the trial court to determine whether summary judgment is appropriate; whether there is a genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. La.Code Civ.P art. 966; *Samaha v.Rau*, 07-1726 (La.2/26/08), 977 So.2d 880. A motion for summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B). Louisiana Code of Civil Procedure Article 966(C)(2) provides:
>
>> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof

6

at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

*Djorghi v. Glass*, 09-461, p. 2 (La.App. 3 Cir. 11/4/09), 23 So.3d 996, 998, *writ denied*, 09-2614 (La. 2/5/10), 27 So.3d 306. In *Djorghi*, we explained the burden of proof in a medical malpractice case, particularly in the context of a motion for summary judgment filed by a defendant, noting:

Louisiana Revised Statutes 9:2794(A) provides "that a medical malpractice plaintiff must establish the following elements by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached the standard of care; and (3) that there was a causal connection between the breach and the resulting injury." *See Brown v. Riverland Med. Ctr.*, 06-1449, p. 4 (La.App. 3 Cir. 3/7/07), 952 So.2d 889, 892, *writ denied*, 07-0740 (La.6/1/07), 957 So.2d 177. Expert testimony is generally required for a medical malpractice plaintiff to establish the applicable standard of care and breach of that standard of care. *Samaha*, 977 So.2d 880. Thus, the defendant is only required to point out that there is an absence of factual support for one or more elements essential to the plaintiff's claim to support that there is no genuine issue of material fact. *Id*.

*Id*.

## DISCUSSION

In granting the defendants' motion for summary judgment in the present case, the trial court ruled that,

[I]t seems to be clear, it's an undisputed fact that Dr. Dunnick did not order the stress test for the 12th of April '01. To the contrary, the evidence is clear that he desired additional information so he could make a final decision whether the stress test would be run. Somebody moved it up, and to require the mover of the motion for summary judgment to go to trial would just be a waste of time and money.

7

In so ruling, the trial court noted that, "Key in this case is what did Dr. Dunnick know at the time he ordered the stress test and . . . why he ordered it the next day."

### *Dr. Leatherman's Affidavit*

The plaintiffs claim that the trial court ignored Dr. Leatherman's opinion that Dr. Dunnick committed malpractice in even **ordering** that Mr. Wofford undergo a stress test given his medical history. The defendants counter that, in his affidavit, Dr. Leatherman neither mentions Dr. Dunnick by name nor states that Dr. Dunnick breached the standard of care. They point out that the basis for Dr. Leatherman's opinion was erroneous in that Dr. Dunnick did not have the opportunity to review the 1999 coronary angiogram because the test was moved up. They further submit that it was precisely because he did not know Mr. Wofford's medical history, coupled with the fact that he wanted additional tests run, that Dr. Dunnick ordered the test to be performed the next day. In sum, the defendants submit that Dr. Dunnick's initial plan of action was appropriate.

The plaintiffs' argument is misplaced. What is crucial is the uncontested material fact that Dr. Dunnick did not "order" that the stress test be performed any earlier than the next day. Accordingly, the plaintiffs cannot prove liability on his part for any damages that may have resulted from the stress test being performed earlier than when he had originally scheduled it. Therefore, the plaintiffs' first assignment of error is without merit.

### *Did a material issue of fact remain to preclude the grant of summary judgment?*

The plaintiffs next contend that a genuine issue of material fact remained as to whether or not Dr. Dunnick ordered that the stress test be moved up, thereby

precluding summary judgment. The plaintiffs base their argument on the trial court's statement that, "So we got the doctor's word against the nurse's word."

The defendants refute the plaintiffs' characterization of this case as one of "he said[,] she said." In his deposition, Dr. Dunnick testified that, "If your question is, did I order the test to be moved up, the answer is no." On the other hand, Nurse Statum did not state that Dr. Dunnick ordered that the test be moved up, and the plaintiffs have offered no other evidence to support their claim that he did so. The defendants further submit that the plaintiffs have taken the trial court's aforementioned quote out of context. To prove their point, the defendants draw this court's attention to the paragraph preceding the quote in question, wherein the trial court stated:

> So what would happen, what's the likelihood at a trial? You got a doctor saying that I was never contacted. I wanted the records before I really run the test. I scheduled it for the 13th to get the benefit of the test. Nobody contacted me and told me they moved it up. The hospital is in control of the testing facilities, okay. They have to actually run the test, okay, and they say well, somebody must [have] told us because we never – – we never in the past change a scheduling without the doctor's okay, but they got no proof that the doctor okayed it. I mean they don't – – he didn't sign off on nothing. They didn't make a note on a form at a certain time I called Dr. So and So and Dr. Dunnick okayed the updating of the test, moving the test up. They don't have nothing like that.

From the above-quoted language we infer, contrary to the plaintiffs' argument, that the trial court had a clear grasp of the evidence before it and that it was not under the mistaken impression that this was a case of "he said, she said." Rather, this is a case of "he said" and no one contradicted what he said. The events leading to this lawsuit occurred on April 12, 2001. The defendants filed their first motion for summary judgment in September of 2004. The plaintiffs have had sufficient time to gather evidence to support their contention that Dr. Dunnick committed malpractice

9

in his treatment of Mr. Wofford. As we stated in *Djorghi*, 23 So.3d at 999, "Without sufficient evidence produced by the plaintiff[s] to establish that [they] will be able to prove the claim at trial, no genuine issue of material fact exists, and the [defendants'] Motion for Summary Judgment was properly granted." Simply stated, the plaintiffs in the present case did not prove that a genuine issue of material fact existed that would preclude a grant of summary judgment in favor of Dr. Dunnick and his insurer. The plaintiffs' second assignment of error lacks merit.

## DECREE

For the foregoing reasons, the trial court's grant of summary judgment in favor of Dr. James Dunnick and his insurer, the St. Paul Fire and Marine Insurance Company, is affirmed. All costs of this appeal are assessed to George, Gail, and Kevin Wofford.

**AFFIRMED.**