STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-585

JACQUELINE BRENNER, ET AL.

VERSUS

DR. RONALD M. LEWIS, ET AL.

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2015-4144
HONORABLE RONALD F. WARE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

JOHN D. SAUNDERS
JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, John D. Saunders, and Candyce G. Perret, Judges.

AFFIRMED.

Cooks, J., dissents and assigns written reasons.

**James E. Shields, Sr.**
**Shields & Shields, APLC**
**30 New England Court**
**Gretna, LA 70053**
**(504) 368-2404**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Jacqueline Brenner**
    **Judith LeBlanc**
    **Estate of Judith LeBlanc**
    **Estate of Elwin C. LeBlanc**

**Benjamin J. Guilbeau, Jr.**
**Marcelynn Hartman**
**Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.**
**Post Office Box 2900**
**Lake Charles, LA 70602**
**(337) 436-9491**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Ronald M. Lewis, M.D.**
    **Louisiana Medical Mutual Ins. Co.**

**Brandon A. Sues**
**Sarah Couvillon**
**Gold, Weems, Bruser, Sues & Rundell**
**P. O. Box 6118**
**Alexandria, LA 71307-6118**
**(318) 445-6471**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Christus St. Patrick Hospital**

**SAUNDERS, Judge.**

This is a case involving a medical malpractice action. Patient's father and sister ("Plaintiffs") instituted this action on behalf of a family member against the patient's primary care physician and his insurance carrier, the hospital and its insurance carrier, (collectively "Defendants") and the Louisiana Patient's Compensation Fund, alleging various acts of negligence arising out of the failure to treat an alleged diagnosis that resulted in the patient's death shortly after her discharge.

Defendants moved for summary judgment on the basis that there was no genuine issue of material fact upon which Plaintiffs could meet the burden of proof required in a medical malpractice case.

After oral arguments were heard, the trial court granted both Defendants' summary judgments and issued written reasons for each.

Plaintiffs now appeal the trial court's ruling. Their argument is that Defendants breached the standard of care owed to the patient in (1) failing to diagnose and treat sepsis, (2) failing to administer antibiotics, and (3) prematurely discharging the patient from the hospital.

**FACTS AND PROCEDURAL HISTORY:**

On February 23, 2011, after experiencing two seizure-like episodes at her home, forty-seven-year-old Judith LeBlanc ("Ms. LeBlanc") was seen in the emergency room of CHRISTUS Health Southwestern Louisiana d/b/a CHRISTUS St. Patrick Hospital ("St. Patrick's") by her primary care physician, Ronald M. Lewis, M.D., ("Dr. Lewis") and was subsequently admitted. At that time, Ms. LeBlanc was receiving treatment for a jaw infection and was scheduled for a tooth extraction the following day.

Over the course of the next few days, Dr. Lewis ordered several tests to rule out multiple potential underlying conditions that could have caused Ms. LeBlanc's seizure activity. All testing was negative. Ms. LeBlanc was alert and showed no signs of distress, dehydration, or sepsis during admit, throughout her hospital stay, or upon discharge. Likewise, she displayed no signs of seizure-like activity, no fever, and no other signs of infection. Relying on test results and on his observations of Ms. LeBlanc, Dr. Lewis made a differential diagnosis, which included several possible diagnoses, one of which was sepsis. However, Dr. Lewis did not treat Ms. LeBlanc for sepsis because her clinical examination was not consistent with sepsis, and she displayed no signs of being septic. Rather, it was Dr. Lewis' opinion, which he discussed with Ms. LeBlanc and her family, that she had possibly suffered a cataplexic event, either due to narcolepsy and/or obstructive sleep apnea. Ms. LeBlanc's family requested that she be discharged as soon as possible because just a few weeks earlier, her mother had unexpectedly passed away in a hospital following spinal surgery. Therefore, because all testing for sleep disorders could be safely arranged at home, Dr. Lewis discharged Ms. LeBlanc with instructions to follow-up in his office in two weeks to schedule the proposed testing following her scheduled oral surgery.

Two days after her discharge from St. Patrick's, Ms. LeBlanc was seen in the Emergency room of Lake Charles Memorial Hospital where she was noted to have difficulty breathing. Subsequently, Ms. LeBlanc developed seizure activity and cardiopulmonary arrest. Cardiopulmonary resuscitation ("CPR") was administered; however, Ms. LeBlanc was unable to be resuscitated and was pronounced dead.

On February 10, 2012, Ms. LeBlanc's father, Elwin LeBlanc, filed a complaint with the Louisiana Patient's Compensation Fund (PCF) requesting a

review of the medical care provided to his daughter by Dr. Lewis during her February, 2011 admission to St. Patrick's.

The Medical Review Panel met and rendered a unanimous opinion in favor Defendants, finding that neither St. Patrick's, nor Dr. Lewis, had breached the standard of appropriate care as charged in the Plaintiffs' complaint.

On October 14, 2015, Jacqueline A. Brenner, Ms. LeBlanc's sister, instituted this lawsuit against Defendants, individually, and on behalf of decedent, Judith LeBlanc, and the estate of Judith LeBlanc, and the estate of Elwin C. LeBlanc, on behalf of decedent Judith LeBlanc.[1] In response, Defendants filed motions for summary judgment seeking to have the Plaintiffs' petition against them dismissed. Their motions relied upon the favorable Medical Review Panel opinion rendered in this matter, as well as the affidavit of James Jackson, M.D.

Plaintiffs opposed the motion, attaching to their opposition the unsigned affidavit of Dr. Terry Shaneyfelt. Therein, Dr. Shaneyfelt noted that "Dr. Ronald Lewis breached the standard of care by not providing antibiotics in a timely fashion to a patient he diagnosed with sepsis." Dr. Shaneyfelt further opined that "[M]s. LeBlanc was not given appropriate antibiotics to cover infection of her jaw which resulted in sepsis and death, a breach of the standard of care. This breach led directly to her death."

After oral arguments were had, the trial court granted summary judgment in favor of Defendants.

Plaintiffs timely filed a motion for devolutive appeal. Pursuant to that motion, Plaintiffs are presently before this court alleging seven assignments of error.

---

[1] Elwin Leblanc, Ms. Leblanc's father, who initiated the claim against the Louisiana Patient's Compensation Fund, passed away on March 2, 2015.

## ASSIGNMENTS OF ERROR:

1. The trial court erred in finding that Appellants malpractice expert, Dr. Terrence Shaneyfelt's, expert testimony was insufficient to create a genuine issue of material fact as to whether Appellee, Dr. Lewis, failed to treat the infection [*sepsis*] that caused Decedent's death.

2. The trial court erred in finding that Appellee, Dr. Lewis, never diagnosed Decedent with *sepsis* on admit into Appellee, St. Patrick's, even though his *"Treatment Plan"* for Decedent was to treat *sepsis* with antibiotics and monitor.

3. The trial court erred in finding that Appellee, Dr. Lewis and/or Appellee, St. Patrick's, did not violate Decedent's *"Patient's Discharge Rights* and *Medicare Discharge Rights,"* when Decedent was forced discharge from St. Patrick's by Dr. Lewis.

4. The trial court erred in accepting the Medical Review Panel's impeached finding that Appellants never begged and pleaded with Appellee, Dr. Lewis, not to force discharge Decedent.

5. The trial court erred in not finding that the Medical Review Panel's *Opinion and Findings* and Appellee, Dr. Lewis' testimony, were not impeached by testimony of Dr. Jon Gray, which created a genuine issue of material fact, pursuant to La.C.C.P. Article 967.

6. The Trial court erred in not admitting Appellee, Dr. Lewis', signed and authenticated *Death Summary* (V2 P293) and *Death Certificate* (V2 P294).

7. The trial court erred in finding that there were no genuine material facts or evidence to show Decedent was diagnosed with *sepsis* on admit from Appellee St. Patrick's emergency department into its hospital ward by Appellee, Dr. Lewis.

## ASSIGNMENT OF ERROR NUMBER TWO:

We will address assignment of error number two because the crux of the matter is whether Dr. Lewis "diagnosed" Ms. LeBlanc with sepsis during her February, 2011, hospital stay at St. Patrick's and as such, is outcome determinative. Plaintiffs contend that the trial court erred in finding that Dr. Lewis never diagnosed Ms. LeBlanc with sepsis on admit into St. Patrick's, even though his treatment plan for her was to treat sepsis with antibiotics and monitor. We disagree.

4

In *Wofford v. Dunnick, M.D.*, 09-1309, pp. 6-7, (La.App. 3 Cir. 4/14/10), 36 So.3d 370,373-74 , this court discussed the standard of review to be employed by an appellate court when reviewing a motion for summary judgment filed in a medical malpractice case:

> A motion for summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria as the trial court to determine whether summary judgment is appropriate; whether there is a genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. La.Code Civ.P art. 966; *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So.2d 880. A motion for summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B). Louisiana Code of Civil Procedure Article 966(C)(2) provides:
>
>> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
>
> *Djorghi v. Glass*, 09-461, p. 2 (La.App. 3 Cir. 11/4/09), 23 So.3d 996, 998, *writ denied*, 09-2614 (La. 2/5/10), 27 So.3d 306. In *Djorghi*, we explained the burden of proof in a medical malpractice case, particularly in the context of a motion for summary judgment filed by a defendant, noting:
>
>> Louisiana Revised Statutes 9:2794(A) provides "that a medical malpractice plaintiff must establish the following elements by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached the standard of care; and (3) that there was a causal connection between the breach and the resulting injury." See *Brown v. Riverland Med. Ctr.,* 06-1449, p. 4 (La.App. 3 Cir. 3/7/07), 952 So.2d 889, 892, *writ denied*, 07-0740 (La. 6/1/07), 957 So.2d 177. Expert testimony is generally required for a medical malpractice plaintiff to establish the applicable standard of care and

breach of that standard of care. *Samaha*, 977 So.2d 880. Thus, the defendant is only required to point out that there is an absence of factual support for one or more elements essential to the plaintiff's claim to support that there is no genuine issue of material fact. *Id*.

In granting St. Patrick's motion for summary judgment in the present case, the trial court stated:

I cannot accept an unsigned affidavit. I cannot accept uncertified medical records. Now, the -- there are some certified medical records, but I think they all have to do with Dr. Lewis and what he did, didn't do, and things of that sort. I don't see where St. Patrick's -- I don't see any evidence that -- from the plaintiff that presents a genuine issue of material fact as it relates to St. Patrick's Hospital.

In so ruling, the trial court noted "[I] don't have enough before me from the plaintiffs to defeat St. Patrick's motion for summary judgment."

In granting Dr. Lewis' motion for summary judgment in the present case, the trial court stated:

When I looked at the record that now has been identified as the differential diagnosis, that's the first thing that came to my mind. These are the list of possible problems, causes, and concerns. And Mrs. [sic] LeBlanc, as I understand it, was alert when she got to the hospital. I know she was alert upon discharge.

. . . .

[I] think it's significant that she was already on antibiotics. . . .

[I]'m going to grant the motion for summary judgment on behalf of Dr. Lewis. . . . If this patient had been diagnosis [sic] with sepsis it would be inconceivable how one could not have committed malpractice by not treating it. The objective signs of sepsis was not there. It was considered, entertained, and found not to be the case upon the -- I don't know, the admission and the discharge.

In so ruling, the trial court noted that. . . . "Shanafield's [sic] affidavit is insufficient to create an issue there, because she was not diagnosed with sepsis."

Plaintiffs contend that Dr. Shaneyfelt's affidavit proves that Defendants breached the standard of care owed to Ms. LeBlanc when Dr. Lewis diagnosed her with sepsis after admitting her to St. Patrick's, subsequently failed to treat her, and

6

prematurely discharged her, which ultimately led to her death. The Plaintiffs' argument is misplaced.

What is crucial is that Dr. Lewis made a differential diagnosis, which included several possible diagnoses, one of which was sepsis. A differential diagnosis is essentially a list of symptoms/disorders that could be the cause of symptoms an individual presents with. A differential diagnosis generally takes into account, among other things, the patient's gender, age, occupation, and medical and family history. Dr. Lewis did not treat Ms. LeBlanc for sepsis because her clinical exam was not consistent with sepsis, and she displayed no signs of being septic during admit, throughout her hospital stay, or upon discharge. Thus, Plaintiffs' argument fails given that Dr. Lewis never diagnosed Ms. LeBlanc with sepsis.

Contrary to the Plaintiffs' argument, the trial court had a clear grasp of the evidence, and/or lack thereof, and it was not under the mistaken belief that St. Patrick's and Dr. Lewis breached the standard of care owed to Ms. LeBlanc when Dr. Lewis diagnosed Ms. LeBlanc with sepsis, and thereafter failed to treat her accordingly. Rather, Plaintiffs failed to provide any evidence against St. Patrick's, and the evidence they did provide against Dr. Lewis simply confirmed that he made a differential diagnosis in which sepsis was one of several possible diagnoses that was subsequently ruled out.

Here, as in *Djorghi*, 23 So.3d at 999, we find that without sufficient evidence produced by the Plaintiffs to establish that they will be able to prove their claim at trial, no genuine issue of material facts exists, and the Defendants' motion for summary judgment was properly granted.

**ASSIGNMENTS OF ERROR NUMBER ONE, THREE, FOUR, FIVE, SIX, and SEVEN:**

Plaintiffs assert seven assignments of error as to why the trial court erred in granting Defendants' motions for summary judgment. Our finding in assignment of error number two pretermits the other six assignments.

## CONCLUSION:

For the foregoing reasons, the trial court's grant of summary judgment in favor of CHRISTUS Health Southwestern Louisiana d/b/a CHRISTUS St. Patrick's Hospital and Ronald M. Lewis, M.D., is affirmed. All costs of this appeal are assessed to Plaintiffs.

**AFFIRMED**.

# STATE OF LOUISIANA

## THIRD CIRCUIT COURT OF APPEAL

### 17-585

JACQUELINE A. BRENNER, ET AL.

VERSUS

DR. RONALD A. LEWIS, ET AL.

**Cooks, J., dissents.**

The majority rests its decision on the same misplaced focus as did the trial court, summing up its position as: "Dr. Lewis did not treat Ms. Leblanc for sepsis because her clinical exam was not consistent with sepsis, and she displayed no signs of being septic during admit, throughout her hospital stay, or upon discharge. Thus, Plaintiffs' argument fails given that Dr. Lewis never diagnosed Ms. Leblanc with sepsis." ***But this is not the issue here on summary judgment***. The determinative issue in this summary judgment proceeding, as in all summary judgment proceedings, is whether or not Plaintiffs, as the non-moving party, have shown that there are genuine issues of material fact that are unresolved at this stage of the proceeding precluding summary judgment in favor of Defendants. At the outset I concede that the Plaintiffs fail to meet this burden as regards St. Patrick Hospital. However, I strongly disagree that the Plaintiffs fail in this regard concerning Dr. Lewis.

Plaintiffs put forth expert medical evidence by Dr. Terry Shaneyfelt, M.D. (Dr. Shaneyfelt) who states in his affidavit:

> **It is part of training and normal standard practice of internists, family practitioners, and hospitalists to prescribe antibiotics for possible infection**.

1

The Medical Review Panel members say "The medical records do not indicate a strict medical necessity for antibiotics during her stay or upon discharge." But Dr. Shaneyfelt and Dr. Gray say the standard of care is "to prescribe antibiotics for possible infection" and "if there is any suspicion of serious infection then give [a] broad spectrum antibiotic." Dr. Shaneyfelt chronicles in his affidavit the medical evidence of record that he says shows signs of possible infection. My review of the record discloses much support for that position. The history given when Judith was admitted to the emergency room indicates she had:

> **Fever**, **chills**, **sweaty, chest pain, breathing difficulty, short of breath, headache, nausea, vomiting, shoulder/arm pain, weakness, lightheaded, dizzy, headache, abdominal pain, recent illness, sore throat, dental problems, cough, diarrhea, black/bloody stools, problems urinating, joint pain, legs/ankles swelling, swollen glands, and confusion.**

According to Dr. Shaneyfelt and Dr. Jon Gray (Dr. Gray), Judith's treating physician at Lake Charles Memorial Hospital (Memorial), *these are classic signs and symptoms of possible infection* and additionally indicate the possibility of sepsis. Dr. Lewis likewise testified in his deposition that "**Sepsis is a criterion by which you classify <u>people with infection</u>. They are to meet the criteria of fever, elevated white count, elevated heart rate, bacteremia in the bloodstream, some sign of infection causing illness.**" Despite the fact that *Dr. Lewis documented all but one of these criteria* he maintains he saw no symptoms or evidence in lab reports that Judith had an infection when she was admitted to St. Patrick Hospital or when he discharged her. As relates to her discharge, the evidence shows Judith's lab reports including blood work were not ready on the day of her discharge until many hours after Dr. Lewis discharged her, thus he could not have known the results nor considered them. He testified that he would

2

not discharge a patient without seeing all the results of testing yet he discharged Judith many hours before the last round of her Hematology and Blood Chemistry test results were available. He says he did this because her family was pressuring him to release her from the hospital. But Plaintiffs maintain they begged him not to release her because she was too ill. When pressed in his deposition on this question Dr. Lewis responded that he could not say Plaintiffs were wrong in this regard, in other words, he admits that Plaintiffs did not want Judith released from the hospital yet he continues to maintain he released her before her final blood work was complete in deference to her family's wishes. That blood work showed abnormal results in every category according to the reference on the reports.[1]

Dr. Lewis' testimony that he saw no symptoms or evidence in lab reports that Judith had an infection when she was admitted to St. Patrick's Hospital or when he discharged her is at odds with Dr. Shaneyfelt's affidavit and according to Dr. Shaneyfelt, is at odds with the medical record. This presents a major genuine issue of material fact which cannot be resolved on summary judgment. Summary judgment is not a substitute for a trial on the merits and the court cannot engage in

---

[1] Hematology
    WBC 10.6 H (4.5-10.0)
    HCT 47.1 H (37.0-47.0)
    PLT 126 L (130-400)
    MCH 32.7 H (27-32)
    NEUT 7.4 H (1.4-7.0)
    MON 0.9 H (0.1-0.8)  (H=high; L=low)
Chemistry
    Sodium 132 L
    Chloride 95 L
    BUN 28.0 H
    Calcium 8.4 L
    Bili Total 2.2 H
    AST/SGOT 61 H
    ALT/SGPT 175 H
    LD 405 H
    Albumin 3.4 L
    ALKP 141 H  (H=high; L =low)

weighing evidence or making credibility determinations between adverse expert witnesses. The medical record shows Dr. Lewis did in fact recognize that *Judith was being treated for an infection related to her jaw and molars when admitted to St. Patrick*, and according to his own notes he included in his plan of treatment the administration of antibiotics. Likewise, the record clearly shows, and Dr. Shaneyfelt testifies, that no antibiotics were given during Judith's hospital stay or upon her discharge from the hospital. Dr. Gray testified that a doctor can make a presumptive diagnosis of sepsis based on symptomology and according to Dr. Shaneyfelt such symptomology was present when Judith presented at St. Patrick Emergency Room (ER). Dr. Gray also testified that "if there is any suspicion that the person has *some serious infection* then he would use a broad-spectrum antibiotic to cover all of our bases." And that is precisely what he did when Judith was admitted to the ER at Memorial and it is what Dr. Shaneyfelt opines should have been done at St. Patrick by Dr. Lewis but was not done. *It is for the trier of fact to determine if such failure in these circumstances falls below the standard of care and such unresolved issue precludes summary judgment.*

The record further contradicts Dr. Lewis' assertion that he did not diagnose sepsis and did not see the need to administer antibiotics because he "saw no evidence to support either." In Dr. Lewis' Plan of Treatment, based on the initial information concerning Judith's condition and the possible causes of the syncope episode which caused her to go to the ER at St. Patrick, Dr. Lewis notes his plan of treatment includes "antibiotics and monitoring for osteomyelitis and/or cellulitis of the right angle of the jaw." Osteomyelitis is defined in Webster's Dictionary as an "inflammation of the bone or bone marrow, *usually due to **infection**" and as "an infectious usually painful inflammatory disease of the bone often of bacterial

4

origin that may result in the death of bone tissue." The Free Dictionary by Farlex defines cellulitis as "an acute, spreading, bacterial infection of the skin and subcutaneous tissues. Cellulitis often originates from an infected wound and can lead to serious illness in the elderly or those with compromised immune systems." Dr. Lewis testified in his deposition that he was aware Judith was taking the medication Embrel for her rheumatoid arthritis and that it "inhibits the immune system" and "can accelerate an infection." All of this, says Dr. Shaneyfelt, shows **Dr. Lewis was at the very least aware of a possible infection for which he should have started giving antibiotics** and he was aware Judith was taking a medication that weakened her immune system and could accelerate an infection. In his testimony Dr. Lewis says he "notes she had been treated for right molar infection for about a week with antibiotics and says he initially considered sepsis as a possible cause of her problem because "[y]ou know she had a molar infection." In response to the direct question "Did she have a right molar infection when you examined her in ER?" he equivocally responded:

> Well, I stated that her face was swollen. Let me see. She does have some swelling in her right face at the angle of her mandible. Some slight erythema and slightly indurated. I mean she had some swelling at the angle of her jaw.

Erythema is defined as a redness of the skin caused by dilation and congestion of the capillaries, *often a sign of inflammation or **infection**.* Indurated refers to a soft tissue that is abnormally firm due to an influx of fibrous tissue elements. *See* American Heritage Dictionary, Fifth Ed., 2016 Houghton Miffler Harcourt Pub. Co. When asked if the blood test he had run on Judith showed any sign of infection Dr. Lewis responded "no" and maintained that the lab report showed her white blood count was "normal." But Dr. Shaneyfelt disputes that representation

5

pointing out the lab report shows on its face an elevated white blood cell count which the report lists as "High," not in normal range. Further, the medical record shows Judith had an elevated liver function, among other abnormal findings, all of which Dr. Shaneyfelt opines also pointed to the need to administer antibiotics. This presents yet another significant genuine issue of material fact as to the breach of standard of care.

The trial court and the majority place much emphasis on the notion that Dr. Lewis made a proper "differential diagnosis" which considered multiple possibilities as causes of Judith's syncope episode and then ruled out a number of possible causes leaving him to conclude that her syncope was caused by syncope. That is meaningless and nonsensical. It is not a diagnosis. Syncope means nothing more than passing out, and a person does not pass out without a reason. It is the cause of the passing out episode that is the riddle to be solved. Dr. Lewis failed to resolve this riddle but released Judith from the hospital without giving her any antibiotics as he planned to do and as two medical experts state he should have done.

Dr. Lewis testified regarding his hospital admit dictation when he first saw Judith at St. Patrick as follows:

"Forty-seven-year-old white female complained of syncope with possible seizure activity. Patient appears being postictal following an episode of loss of consciousness.

Q. What did you make of that?

A. Well, I have to go by what I was told, and it appeared that she may have had a seizure. And when you have a seizure, oftentimes you're sleepy afterwards. It's called postictal state.

Q. You didn't think it was anything to be concerned about?

A. Well, yeah-

6

Q. What was your concern?

A. Well, I mean, she might have had a seizure, and the question is: Number one, is she going to have another one? Number Two is: **What caused it?** (emphasis added)

Thus, according to Dr. Lewis' own statement, his number one immediate concern for Judith was her experiencing another seizure and it was part of his plan to avoid that possibility by administering antibiotics and watching for worsening signs of infection. Despite that this part of his treatment plan was readily available to do, and **according to Dr. Shaneyfelt and Dr. Gray was the prudent and "normal standard practice,"** he did not give Judith any antibiotics for possible infection. It is important to note that Dr. Lewis explained he initially had reason to suspect sepsis and he acknowledges that an "infection causing illness," such as Judith's jaw infection, is a criterion for classifying a person as septic. His plan to determine what was wrong with Judith was to administer a number of tests relating to "seizure disorder; cardiac arrhythmia; vasovagal response; pulmonary embolism; sepsis; cardiac-related arrhythmia; and narcolepsy and/or obstructive sleep apnea" **and** *to give her antibiotics and monitor her for signs of worsening infection of her jaw and molar (osteomyelitis and cellulitis).* Dr. Lewis implemented all of his plan save and except for what turned out to be the most important item, giving Judith antibiotics. According to Dr. Shaneyfelt "Had appropriate antibiotics been given to Ms. Leblanc in a timely fashion she more likely than not would have survived this [possible]infection." He further states Judith "lost her chance of survival by failing to administer appropriate antibiotics."

In addition to a number of routine blood tests and lab work Dr. Lewis ordered in his "plan of treatment" the following **based on Judith's history of**

**"lying in bed ill for the past week" with an infection and suffering a syncope episode and/or a seizure (emphasis added) severe enough to send her to the ER at St. Patrick**:

1. A syncopal workup, to include a workup for PE, with right bundle branch on her EKG and right ventricular hypertrophy as well, and tachycardia, and substernal chest pain, and *a history of lying in bed ill for the past week*,[with an infection] and edema in her lower extremity.

2. Get a tilt-table test.

3. EEG to rule out seizure activity.

4. Signal averaged ECG.

5. Echocardiogram to evaluate LVH and pulmonary hypertense.

6. *Antibiotics and monitoring for osteomyelitis and/or cellulitis of the right angle of the jaw.*

The record shows the tilt-table test was negative. When questioned about his decision to have the signal average ECG test—an electrical tracing of the heart averaging EKG results to test for cardiac arrythmia—*Dr. Lewis says there were no signs or symptoms of cardiac arrhythmia* "but given her history of having fainted and a seizure" *he thought it best to check this out* as a possible cause of her fainting/seizure. But the tests, he concluded, did not indicate this as the cause. The next test was "negative for late potentials" in the ultrasound of the bilateral lower extremities. This was done "to rule out DVT's," deep vein thrombosis, caused by pulmonary embolism as a possible cause of her fainting or syncope. *Again, he stated that nothing he was aware of in her past medical history caused him to consider this possibility yet he had it checked out.* The test showed no evidence of lower extremity DVT's. Dr. Lewis says he concluded from these tests "She doesn't suffer from a cardiac arrhythmia that caused her to be faint, she

doesn't have neurocardiogenic syncope, and she doesn't have a blood clot in her leg that might have gone to her lung to cause her to lose consciousness." The next test was an echocardiogram to evaluate left ventricular and right ventricular functions and valvular disorder which he says he tested due to her "history of syncope." He stated "Well, anytime anybody has a history of possible fainting, aortic stenosis comes to mind. *Now she's a little young for aortic stenosis, but she's not totally out of the realm of having it - - "* (emphasis added) Although this test showed some cause for concern which led to additional testing, Dr. Lewis concluded "her heart was not a concern" but he ordered an echocardiogram just to be safe.[2]

According to Dr. Gray and Dr. Shaneyfelt, Dr. Lewis should have exercised the same cautionary judgment regarding a possible infection based on Judith's current history of infection in her jaw and signs and symptoms that the infection was present and probably getting worse. I repeat again, **Dr. Lewis implemented his plan in every respect except one, he did not give Judith any antibiotics to combat a possible infection (or continued infection) despite his stated plan to do so**. Dr. Shaneyfelt chronicles in his affidavit *medical evidence that he says indicated Judith had an infection and established a basis for administering antibiotics to her* and <u>he does not limit the need for antibiotics to a diagnosis of sepsis.</u> **The failure to give her antibiotics, says Dr. Shaneyfelt, was malpractice in these circumstances.** Dr. Gray's testimony indicates the same. Dr. Lewis admits he was made fully aware that Judith had been lying in bed ill for

---

[2] Two other tests were performed on Judith but these were not ordered by Dr. Lewis. One was a chest x-ray done in the ER when she first arrived, it was negative. There was also a CAT scan of the brain done in the ER and it was negative.

a week before coming to the ER with an infection for which she had been on antibiotics. In Dr. Gray's words, Dr. Lewis should have covered his bases with administration of a broad spectrum antibiotic for the same rationale that Dr. Lewis says he performed all of the tests listed in his plan of treatment, i.e. it was prudent to do so and is was indicated by Judith's current medical history, her physical exam upon admit to the ER at St. Patrick, and her initial blood work. Dr. Shaneyfelt's affidavit, Judith's medical record, and Dr. Lewis' own testimony indicate Dr. Lewis had more reason to follow his own plan of treatment to administer antibiotics and monitor the infection site than he did to perform several of the tests he thought best to do for good measure.

Dr. Lewis testified he would not have released Judith before knowing the result of all of these tests. Good medicine indeed. But, I repeat here, the record shows that Dr. Lewis released Judith many hours before the results of her last Hematology and other lab work were ready and the record shows that every category on her Hematology report was abnormally high or low and every category on her Blood Chemistry work was abnormally high or low. Thus, despite the fact that the litany of tests laid out in Dr. Lewis' plan of treatment offered no explanation for Judith's condition Dr. Lewis released Judith having never given her any antibiotics as planned and without giving her any to take at home. According to Dr. Lewis, after he reviewed all of these test results, he concluded that the cause of her syncope or fainting episode and possible seizure was "syncope." But syncope is not a diagnosis for syncope! Dr. Lewis says he discharged Judith suspecting sleep apnea might be at the root of her problem but she would have to go for more testing to determine that at a later date. Thus, Dr. Lewis released Judith from the hospital without finding any answer to what he says

10

were his two chief concerns, (1) would she suffer another seizure and (2) what caused the syncope/seizure. Dr. Lewis says he would not have released Judith before looking at all of the results of the tests ordered but *he also admits he is unable to produce proof that he looked at those results before discharging Judith and says* **there is no indication in his progress notes to show he looked at the results prior to discharge**.

Q. I'm looking for your progress notes with—showing that you looked at these test results before you discharged her-

A. They may not demonstrate that.

Q. Do any exist?

A. Not that I'm aware of.

Q. Did you write any?

A. No.

In his deposition he also says he "might have" looked at her test results at 12:50 "on the morning of the 25th," her date of discharge. He further testified that his discharge summary is the only document in the record that indicates he looked at the test results prior to discharge but Dr. Shaneyfelt disputes whether the document is actually a discharge summary. Dr. Lewis says that the document titled "Discharge summary" is in fact his discharge summary and that the date on it is a mistake. But Dr. Shaneyfelt says, as an expert witness, that he believes this to be a history and physical because it was dictated on the day of her admission to St. Patrick. Additionally, when asked in his deposition "When you discharged [Judith] what made you believe she didn't have sepsis?" Dr. Lewis answered "Because of her echocardiogram and her other tests I was convinced she had sleep apnea" But Dr. Lewis' alleged reliance on the various tests results as well as the

11

final blood work is called into serious question by his own testimony to the effect that he can point to no charting or progress notes to show he looked at the test results before discharging Judith and the record shows her final Blood Chemistry and Hematology tests were not available until many hours after her discharge. All of this raises genuine issues of fact regarding the propriety of Dr. Lewis' care of Judith and relates to his credibility.

Contrary to the trial court's and majority's assertions Dr. Shaneyfelt's affidavit as a whole does not solely rely on the notion that Dr. Lewis diagnosed sepsis and failed to treat septicemia. A fair reading of the affidavit paints the picture that Dr. Lewis recognized Judith had an infection of the jaw, failed to treat that infection with antibiotics, and his failure to administer antibiotics "to cover the infection of her jaw," (which Dr. Lewis made part of his plan for treatment) "resulted in sepsis and death." **According to Dr. Shaneyfelt this is a breach of the standard of care.** His opinion is bolstered by Dr. Gray. This does not equate to the simple proposition that the trial judge and the majority rely on in granting summary judgment, i.e. that Shaneyfelt relied on the mistaken belief that Dr. Lewis diagnosed sepsis and failed to give antibiotics under such diagnosis. Shaneyfelt relies on the medical records to state his expert opinion that: (1) significant signs of infection of the jaw were present and noted by Dr. Lewis; (2) Dr. Lewis acknowledged these signs and the infection of the jaw which Dr. Lewis said at that time likely resulted from infection of the molar; (3) Dr. Lewis failed to follow his own stated plan of treatment to prescribe antibiotics; (4) the failure to prescribe any antibiotics to address the infection of the jaw "resulted in sepsis and death." Thus, Dr. Shaneyfelt's affidavit and the medical records relied on by him establish many

12

genuine issues of material fact precluding summary judgment. Dr. Shaneyfelt states in his affidavit:

> Dr. Lewis notes in the review of systems he documented in his "Discharge Summary" (though I believe this to be a history and physical since it was dictated the day of admission and not the day of discharge) that "**they do report some fever and chills associated with infection in her jaw and molars** . . .". He goes on to note in his physical examination that **Ms. Leblanc has "some swelling on her right face at the angle of the mandible . . . has some slight erythema and is slightly indurated." He notes in the laboratory data section of this summary that the "white blood cells are 10.6 thousand" (which is elevated per the reference range on the laboratory report.) All this supports that <u>the patient has an infection, likely of the jaw related to the molar infection</u>**. Dr. Lewis documents "E. Sepsis" in his note and under plans writes " 6. <u>**Antibiotics and monitoring for osteomyelitis and/or cellulitis of the right angle of the jaw.**</u>" Unfortunately, no antibiotics are prescribed by my review of the "Doctor's Orders" and the "MD Medication Administration Detail Report." Furthermore, Ms. Leblanc was discharged from the hospital on February 25, 2011 without any prescription for antibiotics. . . Review of the "Discharge Home Medication List" reveals no antibiotics. **It is part of training and normal standard practice of internists, family practitioners, and hospitalists to prescribe antibiotics for possible infection**. According to the Death Certificate, Ms. Leblanc died on February 27, 2011 from "sepsis." **Had appropriate antibiotics been given to Ms. Leblanc in a timely fashion she more likely than not would have survived this infection. She lost her chance for survival by failing to administer appropriate antibiotics**. In summary, <u>**Ms. Leblanc was not given appropriate antibiotics to cover infection of her jaw which resulted in sepsis and death**</u>, **a breach of the standard of care**. This breach led directly to her death.

My reading of Dr. Shaneyfelt's affidavit coupled with my thorough review of the record leads me to conclude that Plaintiffs have met their burden to establish that there are many unresolved genuine issues of material fact that cannot be resolved on summary judgment.

Additionally, Judith died 40 hours after being sent home from St. Patrick and, according to Dr. Lewis, who signed her death certificate, the cause of her death was sepsis. It is very telling that when the ER doctor at Memorial

telephoned Dr. Lewis about Judith he knew she had septicemia before even seeing her. This too, raises questions over the propriety of Dr. Lewis' "differential diagnosis" at St. Patrick and presents a genuine issue of fact as to his negligence in that regard. The trial judge and defendant say the mention of sepsis in Judith's medical records at St. Patrick was part of a "differential diagnosis" not the actual final diagnosis of Judith's problem. But the final diagnosis allegedly arrived at by Dr. Lewis is not a diagnosis at all. According to Dr. Lewis, as reflected in the medical records, his "differential diagnosis," which he identifies in the medical records as his "secondary diagnosis" initially included: "(1)Rheumatoid arthritis, (2) Esophageal reflux, (3) Chronic pulmonary heart disease, (4) swelling of limb, (5) unspecified septicemia, (6) Sepsis, (7) disorder of teeth and supporting structures, and (8) Obstructive sleep apnea." According to the defense, given all of the clinical symptoms, lab reports, and charted stats of this patient, and after considering all of these possibilities as the cause of Judith's being admitted to the hospital foaming at the mouth, incoherent, feverish, with an abnormal white blood cell count, and elevated heart rate, Dr. Lewis concludes that his "Primary Diagnosis" is "syncope and collapse," yet his plan for treatment included the need to administer antibiotics and to monitor the patient's jaw infection. Dr. Sahneyfelt's affidavit and the medical records he relied on as the basis for his expert opinion raise genuine issues of material fact concerning Dr. Lewis' negligence in both his diagnosis and treatment of his patient, all of which precludes summary judgment. For these reasons I respectfully dissent.